**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4031-18

DEBRA LEVIN,

     Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF LABOR,
and EDUCATIONAL TESTING
SERVICE,

     Respondents.

_____

Argued December 2, 2020 – Decided August 4, 2021

Before Judges Fuentes and Whipple.

On appeal from the Board of Review, Department of Labor, Docket No.154,698.

Kevin J. Mahoney argued the cause for appellant (Kreindler & Kreindler, LLP, attorneys; Debra Levin, on the pro se briefs).

Jana R. DiCosmo, Deputy Attorney General, argued the cause for respondent Board of Review (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae-Park, of counsel; Jana R. DiCosmo, on the brief).

PER CURIAM

Appellant Debra Levin appeals from the final decision of the Board of Review (Board) denying her claims for partial unemployment compensation benefits for the week of April 29, 2018, through May 5, 2018. Appellant claims she was "unavailable for work" on April 30, 2018, due to a painful condition in her right shoulder that she described as a "frozen shoulder." In a final decision mailed on April 26, 2019, the Board denied appellant's application for unemployment benefits based on the Appeal Tribunal's decision. After reviewing the record developed before the Board and applying the relevant legal standards, we affirm.

Appellant has worked for the Educational Testing Service as a rater since November 8, 2010. She does not work a conventional forty-hour week. Her work schedule varies depending on her availability and her employer's needs. The employer sends her work schedule two weeks in advance. She is available seven days per week, for a total of twenty to forty hours per week from 8:30 a.m. to 5:00 p.m.

On February 4, 2018, appellant filed a claim for partial unemployment benefits from April 29, 2018, through May 5, 2018. She claimed she was unable to work one day during this seven-day period due to the "frozen shoulder." In a

2

Notice of Determination mailed on June 20, 2018, the Director of Unemployment Insurance informed her that she was not eligible to receive benefits from April 29, 2018, through May 5, 2018, because she was unable to work for one of the shifts offered to her by her employer in that same week. The Director predicated his decision on N.J.S.A. 43:21-4(c)(1), which states that "[a]n unemployed individual shall be eligible to receive benefits with respect to any week eligible <u>only if</u> . . . [t]he individual is able to work, and is available for work, and has demonstrated to be actively seeking work[.]" (Emphasis added).

Appellant sought further review of her claim in the Appeal Tribunal. In her testimony on March 22, 2019, before the Appeal Examiner, appellant confirmed she was scheduled to work two days: Monday April 30, 2018, and Wednesday, May 2, 2018. She testified that when she cancelled her scheduled Monday workday, the employer cancelled her scheduled Wednesday workday. She then described what occurred thereafter:

> Q. Now what is the reason . . . [the employer] cancelled? Do they provide a reason?
>
> A. Not really. I mean they don't have . . . usually [it's] they don't have enough work . . . but you don't get reimbursed when they cancel. So . . . I'm committed to being on that schedule. I can't really do . . . anything else up until . . . even if they cancel last minute

A-4031-18

which they do. So we're not reimbursed for it.

Q. Okay. And were these the morning shift; 8:30 [a.m.] to 5:00 [p.m.]?

A. Yeah. That was the shift.

The Examiner then asked appellant to explain how she apprised her employer that she was unable to work on Monday, April 30, 2018:

Q. So did you notify the [e]mployer that you [were] not gonna [sic] be able to work on that day?

A. Yes. I called them as early as possible and let my . . . shift supervisor know, and then . . . but for some reason, I don't know what happened, but . . . they had me as a no show which I only was able to straighten out weeks later. But, yes, I did notify them and I have emails.

Q. And when did you seek medical attention?

A. That week.

Appellant testified that her physician ordered a magnetic resonance imaging (MRI) scan of her right shoulder and diagnosed her as having a "frozen shoulder." When the Examiner asked her what date she received this diagnosis from her doctor, appellant responded:

Well, the . . . no, the . . . the test had to be read by the . . . you know, interpreted by the . . . they weren't . . . nothing was available to me right away as far as what was going on until they sent the reports to my doctor, the films.

Q. Okay. So how do you know you had a frozen shoulder or did you just have . . . pain.

. . . .

A. [T]he . . . diagnose [was] later in the week, when he interpreted it, and he . . . and he met with me.

Appellant testified that the doctor later told her that she had "classic capsulitis." Although she did not know "what it was called" on April 30, 2018, she testified she was "in agony" and "couldn't even move [her] arms." At this point, the Examiner asked appellant to describe the medical care she received and whether the doctor gave her any instructions about her ability to return to work:

Q. Did the doctor indicate to you that, "You are under my care and you are unable to work for the rest of the week?"

A. No.

Q. Okay.

A. And I made myself available every day.

Q. Okay. So with this . . . severe pain that you [were] experiencing on April 30 of 2018, as of the next day was . . . your shoulder okay?

A. Yes, it was. I . . . took . . . you know, I . . . he suggested I take a pain killer for it, and . . . that did

5

allow me to be able to, you know, move my arm. And I was definitely available for work.

Against this backdrop, the Appeal Tribunal found appellant was not eligible to receive unemployment compensation benefits from April 29, 2018, through May 5, 2018, "as there were less than seven (7) eligible days during that calendar week, in accordance with N.J.S.A. 43:21-4(c)(1) and N.J.S.A. 43:21-19(q)."

In this appeal, appellant relies on the Supreme Court's decision in Krauss v. A. & M. Karagheusian, Inc., which crafted the following test to determine employee eligibility for unemployment benefits in 1953:

> In determining whether a claimant is entitled to benefits the "available for work" test under subsection 4 (c) is of first importance. The availability requirement is a test to discover whether claimants would, in actuality, now be working, were it not for their inability to obtain work that is appropriate for them. The test is met if it appears that the individual is willing, able and ready to accept suitable work which he does not have good cause to refuse, that is when he is genuinely attached to the labor market.
>
> [13 N.J. 447, 457-58 (1953) (internal citations omitted) (emphasis added).]

Applying the Krauss test, appellant argues that she was "available to work" during the disputed seven-day period of April 29, 2018, through May 5, 2018, because: (1) she was "holding onto and continues [sic] an ongoing job;"

6

and (2) she was available for work during six out of the seven days required by her employer. However, as the Board correctly points out, the <u>Krauss</u> test was superseded by the Legislature in 1961 when it adopted N.J.S.A. 43:21-4(c)(1). <u>Self v. Bd. of Rev.</u>, 91 N.J. 453, 456-57 (1982). The Supreme Court thereafter clarified the scope of the standard in N.J.S.A. 43:21-4(c)(1) by approvingly quoting the Board of Review's holding in <u>De Lorenzo v. Bd. of Rev.</u>:

> The Board now holds that when an employee becomes ill and does those things reasonably calculated to protect the employment and, notwithstanding that she is not reinstated, there is no voluntary leaving of work. <u>In these matters involving separation from employment for health reasons, the Board now holds that the disqualification arises only upon a finding that the employee, in fact, decided to terminate the employment because the work duties are detrimental to an existing physical condition or state of health which did not have a work connected origin</u>.
>
> [54 N.J. 361, 364 (1969) (emphasis added).]

The Department of Labor codified this standard in N.J.A.C. 12:17-9.3(c), which provides:

> [A]n individual who has been absent because of a personal illness or physical and/or mental condition shall not be subject to disqualification for voluntarily leaving work if the individual has made a reasonable effort to preserve his or her employment, but has still been terminated by the employer. A reasonable effort is evidenced by the employee's notification to the

employer, requesting a leave of absence or having taken other steps to protect his or her employment.

Of particular relevance here, an individual who leaves work for health or medical reasons must submit a medical certification "to support a finding of good cause attributable to work." N.J.A.C. 12:17-9.3(d). Based on the record before us, it is undisputed that appellant did not follow this requirement. Partial unemployment benefits are intended to ameliorate the economic hardship suffered by those individuals who are underemployed rather than completely employed. See N.J.S.A. 43:21-19(q). Eligibility for unemployment benefits is based on the applicant's adherence to the relevant statutory and regulatory guidelines.

We review the factual findings of a State administrative agency under a deferential standard of review. Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997). We will not disturb these findings unless they are not supported by sufficient credible evidence in the record. Ibid. Here, the evidence supports the Board's findings that appellant's medical condition was not caused by a work-related activity. It is also undisputed that appellant did not present the medical certification required by N.J.A.C. 12:17-9.3(d) to support her claim of eligibility for unemployment benefits.

Finally, there is no factual basis to support appellant's claims that the Board violated her due process rights. Appellant's argument in support of this claim is based on unsupported speculation of wrongdoing regarding an earlier decision by the Board to remand the matter to the Appeals Tribunal for reconsideration due to an inaudible record. We conclude this baseless claim lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION